**UNITED STATES of America,**

**v.**

**Larry D. COLEY, Jr., Defendant.**

**Crim. Action No. 97–0085(JR).**

United States District Court, District of Columbia.

Aug. 12, 1997.

Leutrell M.C. Osborne, II, Asst. U.S. Atty., Washington, DC, for U.S.

Billy L. Ponds, Washington, DC, for Larry D. Coley, Jr.

## *MEMORANDUM ORDER*

ROBERTSON, District Judge.

On June 30, 1997, I granted defendant's motion to suppress guns, drugs and ammunition seized by the police from a motor vehicle driven by defendant and to suppress a statement made by defendant. The government has moved for reconsideration. The motion for reconsideration presents a legal theory different from, and inconsistent with, the government's original submission. The facts have not changed, however, and they are serious enough facts to compel reconsideration even if the government's legal theory has changed.

### Facts

On January 29, 1997, Officer Dennis Bosak initiated a traffic stop of a Chevrolet Citation hatchback after he noticed that the vehicle had an expired Virginia inspection sticker. Bosak learned through police radio communications that the tags on the vehicle were issued for a Toyota, and not for the car he

had stopped. Bosak approached the car and asked defendant, who was driving, for his vehicle registration. Defendant failed to produce it, telling Bosak that he and his brother had bought the car at an auction. Bosak asked defendant whose tags were on the car. Defendant admitted that the tags were issued for his brother's Toyota.

Bosak then asked defendant to step out of the car, intending "to place him under arrest for operating an unregistered vehicle." Tr. 9.[1] The officer told defendant to put his hands on the car and, as he began to search him, asked defendant whether he had any weapons or drugs on his person. Tr. 9–10. Defendant nodded his head toward the trunk of the car and said that he and his passenger had just come from the pistol range in Maryland. Tr. 10. At that point, Bosak stepped defendant to the rear of the car, handcuffed him, and searched the car. He opened the trunk of the hatchback with the trunk key. There he found one pistol in a green knapsack, another in a box next to the green knapsack, and—inside a jacket thrown over the knapsack and the other pistol—24.3 grams of crack cocaine. He also found ammunition. As Bosak was opening the knapsack and looking inside, defendant said, "That's mine." When Bosak began to search the jacket, defendant said, "Oh, fuck."

Defendant moved to suppress the physical evidence and all of the statements. The government's first opposition maintained that the rear of the hatchback was part of the interior compartment of the vehicle and subject to search incident to defendant's lawful arrest. *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981).[2] At the first evidentiary hearing, both sides focused on the question whether driving an unregistered vehicle was an "arrestable offense" for purposes of *Belton.* A second evidentiary hearing was conducted to establish the precise configuration of the hatchback vehicle, the position and condition of the rear seats, and whether access to the rear

compartment was available without using the trunk key.

A few days before the second evidentiary hearing, the government filed a second opposition to defendant's motion. In that submission, the government suggested for the first time that defendant was not arrested until *after* the search of the vehicle. I did not hear argument at the second evidentiary hearing, and, in my June 30 order granting the motion to suppress, I made only passing reference to the government's new position, concluding that it conflicted with Bosak's testimony. Order of June 30, 1997 at 3 n. 3.

### Analysis

The government's motion to reconsider argues that Bosak's actions and questions were lawful in the context of the investigatory stop he had initiated and that defendant was not in custody when he made the incriminating statement that gave Bosak probable cause to search the automobile. Upon reconsideration of the entire record and for the reasons set forth below, the motion will be denied as to defendant's responses to Bosak's question about weapons and drugs but granted as to the physical evidence. The drugs, guns and ammunition appear to be admissible.

#### 1. *The Terry stop*

■ In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court rejected a Fourth Amendment challenge to investigative detention by law enforcement officers. Subsequent decisions have established that a police officer who lacks probable cause but whose " 'observations lead him reasonably to suspect' that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to 'investigate the circumstances that provoke suspicion.' " *Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984) (quoting *United States v. Brignoni–Ponce,* 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975)). Such a "stop and inquiry must be reasonably related in scope

---

1. All transcript citations (Tr.) refer to the May 21, 1997 evidentiary hearing.

2. The government's alternative arguments were that the weapons were in plain view (they were

not) and that the evidence would have been "inevitably discovered" as part of an inventory search (Bosak's testimony foreclosed that argument).

to the justification for their initiation." *Id.* (internal cites and quotes omitted). An officer "may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Id.* Our Court of Appeals applied the *Berkemer* analysis in *U.S. v. Gale,* 952 F.2d 1412 (D.C.Cir.1992), and the government now argues that *Gale* controls my decision in the case at bar.

In *Gale,* law enforcement officers received a tip from a reliable informant that the driver of a particular vehicle possessed drugs. Acting on the tip, the officers pulled the vehicle over and blocked its movement. Two officers then approached the car, one on each side. The officer on the driver's side asked for the suspect's license. The name on the license corresponded with the informant's identification of the suspect. The officer told the suspect to step out of the car and, while the suspect was still in the car, asked if he had any drugs. The suspect said he had drugs and removed bags of crack cocaine from an area between the front seats of the car. The officer then ordered the suspect out of the car and arrested him.

The District Court denied defendant's motion to suppress, and the Court of Appeals affirmed, holding that pulling the suspect over, blocking his car, and approaching the car to question him did not amount to an arrest. *Id.* at 1415. The court held further that the officer's request for a driver's license and his questions about drugs were "reasonably related in scope . . . to determine [the suspect's] identity and to try to obtain information confirming or dispelling [their] suspicions that he was in possession of illegal drugs." *Id.* (internal quotes and citations omitted).

▬▬ In the instant case, as in *Gale,* the officer's questions about defendant's registration, about who owned the vehicle, and about whose tags were on the car were reasonably related in scope to Bosak's reasonable and articulable suspicion that he had stopped the driver of an unregistered car.[3] But because Officer Bosak did not fear for his safety at any time during the incident, Tr. 36, his pat down search of defendant was not "reasonably related in scope" to his reasonable and articulable suspicion.[4] Furthermore, because Officer Bosak had no reason to believe that defendant had committed any criminal offense except driving an unregistered vehicle, Tr. 38–39, his question about guns and drugs went beyond an effort to confirm or dispel his suspicions.

### 2. *The Miranda rule*

At one time, "courts believed that at the moment the amount of force used by police officers turned a *Terry* stop into a Fourth Amendment arrest, the suspect was in custody under the Fifth Amendment, and *Miranda* warnings became necessary." Mark A. Godsey, "When *Terry* Met *Miranda*: Two Constitutional Doctrines Collide," 63 Fordham L.Rev. 715, 726 (1994). *See United States v. White,* 648 F.2d 29, 34 (D.C.Cir.), *cert. denied,* 454 U.S. 924, 102 S.Ct. 424, 70 L.Ed.2d 233 (1981) ("[w]hether there has been an arrest turns on whether there has been an imposition of custody"). As Justice Marshall observed in *Berkemer,* "[t]he comparatively nonthreatening character of [*Terry* stops] explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda.*" 468 U.S. at 440, 104 S.Ct. at 3150.

Since *Berkemer,* however, the courts have expanded the notion of what is a proper *Terry* stop far beyond the "comparatively nonthreatening . . . detentions" Justice Marshall had in mind. The line between *Terry* stop and arrest is now almost unrecognizable. A leading (and controlling) example in this Circuit is *United States v. Clark,* 24 F.3d 299 (D.C.Cir.1994), in which the Court of Appeals found that a *Terry* stop was still a *Terry* stop, and not an arrest, when the officer

---

3. Bosak's direction that defendant step out of the car was routine. *Pennsylvania v. Mimms,* 434 U.S. 106, 111, 98 S.Ct. 330, 333–34, 54 L.Ed.2d 331 (1977).

4. *See also United States v. Clark,* 24 F.3d 299, 304 (D.C.Cir.1994) (no search without justifiable reason to believe defendant armed and dangerous); *United States v. Laing,* 889 F.2d 281, 285–86 (D.C.Cir.1989) (quoting *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968)).

ordered the defendant out of his car at gunpoint, patted him around the waist to see if he was armed, and made him kneel at the rear of the car under the watchful eye of another policeman as the arresting officer searched the vehicle for weapons.

The judicially approved escalation of *Terry* stops has given rise to scholarly rumination about the interplay of the Fourth and Fifth Amendments and about what is left of the *Miranda* rule. *See* Godsey, *supra;* Richard A. Williamson, "The Virtues (and Limits) of Shared Values: The Fourth Amendment and Miranda's Concept of Custody," 1993 U. Ill. L.Rev. 379; Note, "Custodial Engineering: Cleaning Up the Scope of *Miranda* Custody During Coercive *Terry* Stops," 108 Harv. L.Rev. 665 (1995). During a *Terry* stop, what might otherwise be custody is called investigative detention, and what might otherwise be interrogation is called pursuit of articulable suspicion. In the *Clark* case, for example, while the defendant was on his knees being guarded by another policeman, and while the car was being searched, the policeman guarding the defendant told him that, "if they found any drugs, they might have to seize the car." 24 F.3d at 301. Defendant then said that the drugs were under the driver's seat. The Court of Appeals concluded that the "use of force did not convert the stop into arrest" and that defendant "voluntarily informed [the officer] that there were drugs under the front seat of the car. . . ." *Id.* at 304. The court never reached the question whether the officer's suggestive statement amounted to custodial interrogation under the rule of *Rhode Island*

*v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

In this case, however, Officer Bosak's candid testimony that he was in no fear for his personal safety and that he had no suspicion about the guns and drugs removes the *Terry* umbrella from his encounter with defendant and makes analysis of the *Miranda* issue necessary. That issue is whether defendant's statement about having just come from the pistol range, together with his expressive nod of the head toward the trunk of the Citation, was a response to "questioning initiated by law enforcement officers after [he had] been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).[5]

■ The answer must be that Officer Bosak's inquiry to defendant about guns and drugs was custodial interrogation. A reasonable person in defendant's position would have believed that he was in custody when Officer Bosak directed him to place his hands on the car and began to pat him down. *See Berkemer,* 468 U.S. at 442, 104 S.Ct. at 3151–52. Moreover, Bosak's question was reasonably likely to elicit an incriminating response. *See Innis,* 446 U.S. at 301, 100 S.Ct. at 1689–90.[6] Bosak was required to give a *Miranda* warning before engaging in custodial interrogation. Because he did not do so, defendant's statement about having just come from the pistol range, as well as evidence of his expressive nod of the head toward the rear of the Citation,[7] will not be admissible.

---

5. Much of the scholarly writing attempts to deal with the Supreme Court's cryptic, and per curiam, suggestion that custody is "restraint of freedom of movement of the degree associated with formal arrest," *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (internal quotes and citation omitted), and on whether that language signaled a merger of Fifth Amendment "custody" analysis with Fourth Amendment "arrest" analysis. In this Circuit, however, the "critical event [for *Miranda* purposes] is not necessarily the formal arrest of the defendant, but rather the time at which he came into custody." *United States v. Moore,* 104 F.3d 377, 388–89 (D.C.Cir.1997).

6. *United States v. Bogle,* 114 F.3d 1271, 1275 (D.C.Cir.1997) holds that whether or not "inter-

rogation" has taken place depends at least in part on whether an officer has reason to believe that his questions will elicit incriminating responses. The opinion, however, confirms that the dispositive test is an objective one. If it were otherwise, there would be no limit to police questioning during street detentions: either the officer suspects something, in which case he may pursue that suspicion as part of a *Terry* inquiry; or he does not, in which case his questions are not interrogation.

7. *See Pennsylvania v. Muniz,* 496 U.S. 582, 594–95 & n. 9, 110 S.Ct. 2638, 2646–47 & n. 9, 110 L.Ed.2d 528 (1990) (establishing that non-testimonial expressive behavior is covered by the Fifth Amendment Self–Incrimination Clause).

### 3. The physical evidence

 Evidence obtained as a direct result of actions that violate the Constitution is inadmissible against a defendant in the government's case-in-chief. The exclusionary rule also applies, through the "fruit of the poisonous tree" doctrine, to evidence proximately derived from unconstitutional actions. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Here, the defendant suggests that the physical evidence recovered from his vehicle must be suppressed because his own statement, elicited in violation of the *Miranda* rule, led to its discovery. The law does not require such an outcome.

 The prophylactic warnings established in *Miranda* are not themselves rights protected by the Constitution. *Michigan v. Tucker*, 417 U.S. 433, 444, 94 S.Ct. 2357, 2363–64, 41 L.Ed.2d 182 (1974). In the absence of proof of unconstitutional conduct, there is no requirement that statements in violation of the *Miranda* rule *"and their fruits* be discarded as inherently tainted." *Oregon v. Elstad*, 470 U.S. 298, 307, 105 S.Ct. 1285, 1292, 84 L.Ed.2d 222 (1985) (emphasis added). *See, e.g., New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) (establishing the public safety exception to the exclusionary rule); *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) (establishing that un-Mirandized statements may be introduced for impeachment purposes). Physical evidence obtained because of a statement taken in violation of the *Miranda* rule need not be suppressed *because of the Miranda violation.* If a statement that reveals the existence or location of physical evidence is voluntary [8] and not itself the product of a constitutional violation, the physical evidence will be admissible unless excluded for some other reason. *See United States v. Elie*, 111 F.3d 1135, 1141–42 (4th Cir.1997); *United States v. Gonzalez-Sandoval*, 894 F.2d 1043, 1048 (9th Cir.1990); *Unit-*

---

*ed States v. Sangineto–Miranda*, 859 F.2d 1501, 1517–18 (6th Cir.1988).

 Defendant in this case revealed the existence and location of the guns with a single sentence and a gesture made in response to a single question. He had been in custody only for a moment. The record contains no evidence of coercive police activity or compulsion of any kind. Defendant's statement thus appears to have been voluntary, and, although it will be suppressed because of the *Miranda* violation,[9] it provided probable cause for Bosak's lawful search of the trunk of the hatchback, where the contraband was found. *California v. Acevedo*, 500 U.S. 565, 570, 111 S.Ct. 1982, 1986, 114 L.Ed.2d 619 (1991).

It is accordingly this 12th day of August, 1997,

**ORDERED** that the government's motion for reconsideration [# 29] is **granted in part** and **denied in part.**

---

8. In the context of the Fifth Amendment, "coercive police activity is a necessary predicate to the finding that a [statement] is not 'voluntary'...." *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986).

9. Defendant's two exclamations, made when the guns were found and the drugs were about to be found, were spontaneous. They will not be suppressed. Order of June 30, 1997 at 7–8.